IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2010 SEP 20  AM 10: 35

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
DEPUTY

TONY SMITH,
                **Plaintiff,**

-vs-                                             Case No.  A-09-CA-620-SS

**HUBERT ARTURO "ART" ACEVEDO, in his
official capacity as Chief of Police of the City of
Austin and in his personal capacity; MIKE
CRONIG, in his official capacity as Assistant City
Attorney of the City of Austin and in his personal
capacity; CITY OF AUSTIN,**
                             **Defendants.**

---

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendants' Motion for Summary Judgment [#22], Plaintiff Tony Smith ("Plaintiff")'s responses thereto [#29, #34, #35], and Defendants' Reply [#37]; Plaintiff's Corrected Motion For Summary Judgment [#25], Defendants' response thereto [#28], Plaintiff's Reply [#38], and Defendants' Motion to Strike Plaintiff's Reply [#39].  Thereafter, having reviewed the aforementioned documents, the applicable law, and the case file as a whole, the Court enters the following opinion and orders.

### Background

Plaintiff filed this suit in response to his termination from the Austin Police Department ("APD") on September 10, 2008.  First Am. Compl. [#8] at ¶ 6.01.  Plaintiff claims Defendant Acevedo, APD Police Chief, and Defendant Cronig, Assistant City Attorney, wrongfully terminated

-1-

him because he "made comments critical of Chief Acevedo's action in indefinitely suspending a fellow officer." *Id.* Plaintiff makes five claims: (1) the APD policy which formed one basis for his termination constitutes a prior restraint on the exercise of free speech; (2) Defendants wrongfully retaliated against him by terminating him for the legal exercise of his First Amendment rights; (3) Defendants deprived him of his "liberty and property rights," in violation of 42 U.S.C. § 1983; (4) Defendants committed the state law tort of defamation; and (5) Defendants conspired together to slander him. *See id.* at ¶ 7.01–7.09.

Defendants deny these claims and further assert, among others, the affirmative defenses of: limitations regarding Plaintiff's defamation and conspiracy claims; qualified and official immunity; and the protections of the Texas Tort Claims Act. First Am. Ans. [#10] at 3, 5.

For the following reasons, Plaintiff's motion for summary judgment is GRANTED with respect to claim (1) above and DENIED with respect to all other claims. Consequently, Defendants' motion is likewise GRANTED in part and DENIED in part.

## Facts

### 1. The 2008 Incident

The background facts of this case are substantially undisputed. Plaintiff was employed as a patrol officer with APD until his termination on September 10, 2008. The events leading up to his termination occurred on June 2, 2008. On that date, Plaintiff and other officers were in the "show-down" room of the Central East Substation prior to Plaintiff's shift.[1] Some officers were

---

[1] Prior to every patrol shift, officers received a briefing, during which official information was disseminated and topics discussed; this briefing took place in a "show-up" room. Similarly, at the end of each patrol shift, officers reported to a "show-down" room where they completed their reports and turned in their evidence prior to being dismissed. The "show-down" room contained computers for this purpose, as well as a bulletin board. Both the "show-up" and "show-down" rooms were designated as "controlled access areas" by APD General Order A313, meaning the public could only access them after being authorized by security personnel.

discussing the termination of APD Sergeant Dustin Lee for sexual harassment and dishonesty; Lee's termination had occurred three days prior. Plaintiff recalled having previously read a newspaper story indicating Defendant Acevedo had himself been accused of sexual harassment at a former job.

Plaintiff used a City computer to visit a website that contained potentially embarrassing allegations against Defendant Acevedo. Plaintiff copied text from the website to a word processor and printed the document on a City printer. Plaintiff discussed the document with one or more officers.[2] In her Internal Affairs memorandum, Officer Anderson states Plaintiff said something about Defendant Acevedo similar to, "Now how is going [sic] to talk, when he has done the same thing."[3] Def. Mot. Summ. J., Ex. A ("Anderson Memo"). Later, Plaintiff posted the document on the bulletin board in the "show-down" room, where it could be viewed by members of every patrol shift. Plaintiff acknowledged the allegations in the document were potentially highly personal and embarrassing to Defendant Acevedo. Def. Mot. Summ. J., Ex. B ("Pl. Depo.") at 82–83. He further acknowledged he did not know at the time he posted the document whether the allegations were true. Later that morning, Officer James Purcell, an officer on Plaintiff's shift, reported Plaintiff's behavior to Sergeant Slater, a supervisor from another shift.[4] Sergeant Slater reported the incident up the chain of command to Commander Rob Gamble, who initiated an Internal Affairs complaint against Plaintiff on June 3, 2008. Plaintiff

---

[2] In his Internal Affairs deposition, Plaintiff indicated there were "several" people involved in the discussion. *See* Def.'s Mot. Summ. J., Ex. A ("COA 1510") at 3. In his 2010 deposition, Plaintiff indicated he only spoke to fellow officer Staci Anderson. Def.'s Mot. Summ. J., Ex. B ("Pl. Depo.") at 74–75.

[3] Plaintiff does not specifically recall making this remark to Officer Anderson, but acknowledges it was "a very typical statement that I would make to her." Def.'s Mot. Summ. J., Ex. B ("Pl. Depo.") at 84–85.

[4] Officer Purcell indicated he reported Plaintiff's conduct to Sergeant Slater in part because his own supervisor, Sergeant Hightower, was no longer present.

signed a memorandum acknowledging receipt of the complaint on June 16, 2008.

**2.      2008 APD Investigation**

Internal Affairs sent an "Investigative Summary" memo to Defendant Acevedo on August 6, 2008.  The memo reflected that Internal Affairs interviewed Plaintiff as well as alleged witnesses Officer James Purcell and Officer Robert Justesen, and received written statements from Sergeant Slater and Officer Anderson.  Plaintiff was represented by counsel during his interview.  The memo recommended sustaining allegations against Plaintiff for violations of two APD General Orders: A312.03(A)(1), for improper computer use; and A201.04(G)(2), for criticizing the Department in a way that was defamatory and undermined the effectiveness of the Department.

On August 27, 2008, the Department conducted a Disciplinary Review Hearing ("DRH") for Plaintiff.  Because he was involved in the subject matter of the complaint, Defendant Acevedo recused himself and appointed Assistant Chief Holt to conduct the DRH.  Plaintiff was able to review evidence against him prior to the hearing.  Plaintiff was represented by counsel at the hearing.  The hearing was recorded and transcribed.  At the outset of the DRH, Defendant Cronig advised Plaintiff that Defendant Acevedo was considering adding an allegation of insubordination against Plaintiff.  Plaintiff had an opportunity to answer questions and make statements, and opted to do both.  In a prepared statement he read into the record, Plaintiff stated, "I understand that some of my actions were violations of department policy."  Def.'s Mot. Summ. J., Ex. C ("Pl. DRH Aff.") at 3.  At the conclusion of the DRH, Plaintiff's chain of command recommended to Defendant Acevedo that all allegations, including the additional allegation of

insubordination, be sustained.[5]  Defendant Acevedo agreed with the recommendation and sustained all of the allegations against Plaintiff.

### 3.   Plaintiff's 2005 Agreed Suspension and 2008 Termination Memo

Both the chain of command and Defendant Acevedo reviewed Plaintiff's work history before deciding on an appropriate punishment.  Of particular significance to their decision, and of particular importance to Plaintiff's defamation claim here, was a 2005 agreed 60-day suspension of Plaintiff.   The April, 2005 memo from then-Chief Stanley Knee indicated Plaintiff was suspended because of  an "inappropriate personal relationship [which] he knew would bring discredit upon himself and the Austin Police Department, and as a result of that relationship, also committed several other acts in violation of Department policy."  Def.'s Mot. Summ. J., Ex. A ("2005 Memo") at 2.  The memo further indicated Plaintiff was insubordinate because he refused to terminate the relationship when ordered by his chain of command.  Specifically, the memo stated that Plaintiff violated five APD rules and regulations: (1) A201.02(H)(1), "Associating with Persons of Bad Reputations"; (2) A201.03(E)(3)(d)(e), "Unethical Interference with Investigation or Legal Process"; (3) A201.01(C)(1)(2), for committing the Texas state law crimes of criminal conspiracy and money laundering; (4) A201.04(E)(1), for insubordination; and (5) A312.03(A)(1), for unauthorized computer use.  Id. at 2–4.  Plaintiff signed the memo on April 20, 2005, acknowledging both receipt and his understanding that he forfeited his right to appeal in return for the Chief not exercising his right to terminate Plaintiff for the described conduct.  Id. at 5.  In his 2008 memo memorializing his termination of Plaintiff, Defendant Acevedo further

---

[5] Defendant Acevedo states that although the APD Chief may recuse himself from a DRH, he must personally make all decisions regarding final disciplinary action.

described Plaintiff's alleged 2005 conduct.[6]  Specifically, the 2008 memo stated Plaintiff had a "sexual relationship with a known user of methamphetamine," he misused City equipment by "checking the woman for warrants at her request," he "failed to take police action when he believed the woman was purchasing drugs," and he committed the Texas state law crimes of criminal conspiracy and money laundering because he "gave her advice to obtain a receipt for cleaning services she did not perform as a way of hiding the fact that she purchased drugs." Def.'s Mot. Summ. J., Ex. A ("2008 Memo") at 4.  Defendant Acevedo acknowledged he included this information not because of his personal knowledge of the events, but because former chief Knee sustained the allegations against Plaintiff in 2005.  Pl.'s Mot. Summ. J., Ex. A ("Acevedo Depo.") at 15–16.  Ultimately, the chain of command recommended Plaintiff be "indefinitely suspended."[7]  However, Defendant Acevedo initially offered, through Defendant Cronig, to let Plaintiff resign or to accept a "last chance agreement" and a 30-day suspension in lieu of termination;[8] Plaintiff rejected both offers.  Defendant Acevedo signed the 2008 memo terminating Plaintiff on September 10, 2008.  The document indicated Plaintiff refused to sign. In accordance with Texas Local Government Code § 143.052(c), Defendant Acevedo filed the 2008 memo with the Civil Service Commission and delivered a copy to Plaintiff.[9]

---

[6] Plaintiff argues his signature on the 2005 memo does not constitute agreement with the allegations contained therein. Pl.'s Resp. Summ. J. [#29] at 3.  Plaintiff specifically disputes the allegations that he engaged in conduct constituting the Texas state crimes of criminal conspiracy and money laundering. *Id.* at 2–4.  Because it is unclear whether Plaintiff disputes the remainder of the allegations in the 2005 memo, the Court assumes he does.

[7] APD uses the term "indefinite suspension" to describe termination. *See* TEX. LOC. GOV'T CODE ANN. § 143.052(b) (West 2008) ("An indefinite suspension is equivalent to dismissal from the department.").

[8] A "last chance agreement" provides that if an officer is subsequently found to have violated general orders, he can be terminated without the right to an appeal.

[9] "If the department head suspends a fire fighter or police officer, the department head shall . . . file a written statement . . . giving the reasons for the suspension.  The department head shall immediately deliver a copy . . . to the suspended fire fighter or police officer." LOC. GOV'T. § 143.052(c).

4.    **Plaintiff's Appeal**

Plaintiff appealed his suspension as provided by Local Government Code § 143.053. Plaintiff was represented by counsel, was able to present evidence, subpoena witnesses and documents, examine and cross-examine witnesses, invoke the rule, submit evidentiary motions, make objections, and make opening and closing remarks. The independent hearing examiner denied Plaintiff's appeal in a written opinion on May 4, 2009. Plaintiff filed his original complaint with this Court on August 14, 2009.

## Analysis

Summary judgment may be granted if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding summary judgment, the Court construes all facts and inferences in the light most favorable to the nonmoving party. *Richter v. Merchs. Fast Motor Lines, Inc.*, 83 F.3d 96, 98 (5th Cir. 1996). The standard for determining whether to grant summary judgment "is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the nonmoving party based upon the record evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990). Both parties bear burdens of production in the summary judgment process. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The moving party has the initial burden of showing there is no genuine issue of any material fact and judgment should be entered as a matter of law. FED. R. CIV. P. 56(c); *Celotex*, 477 U.S. at 322–23; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The nonmoving party must then come forward with competent evidentiary materials establishing a genuine fact issue for trial, and may not rest upon mere allegations or denials of its pleadings. *Anderson*, 477 U.S.

at 256–57; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87

(1986). Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the non-

movant's burden. *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

**1.     Prior Restraint**

Plaintiff claims APD General Policy A201.04.(G)(2) (the "General Policy") constitutes a

facially impermissible prior restraint on the First Amendment right to free speech. For the

following reasons, the Court agrees.

The General Policy states:

> Employees shall not criticize or ridicule the Department, its policies, or employees by
> speech, writing, or other expression, when such speech, writing, or other expression:
> > a. Is defamatory, obscene, or unlawful;
> > b. Tends to interfere with or to undermine the effectiveness of the
> > Department to provide public services;
> > c. Tends to interfere with the maintenance of proper discipline;
> > d. Tends to adversely affect the confidence of the public in the integrity of
> > the Department and/or its employees;
> > e. Improperly damages or impairs the reputation and efficiency of the
> > Department; or
> > f. Is made with reckless disregard for truth or falsity.

APD General Policy A201.04(G)(2).

Plaintiff argues the General Policy is unconstitutional on its face. A facial challenge to

the constitutionality of a statute is a pure question of law. *Ctr. for Individual Freedom v.*

*Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006). In general, to mount a successful facial attack,

"the challenger must establish that no set of circumstances exists under which the Act would be

valid." *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). However, because of

the well-established overbreadth doctrine, facial First Amendment challenges "need only show

that a statute or regulation 'might operate unconstitutionally under some conceivable set of

circumstances.'" *Id.* (quoting *Salerno*, 481 U.S. at 745).

Defendants argue the General Order does not meet this criterion because it does not limit protected speech. Def.'s Mot. Summ. J. at 18. They note that the First Amendment does not protect speech that is defamatory, obscene, or unlawful. *Id.* at 19. They also argue that the government may legitimately impose restrictions on speech that "interferes with the efficient provision of services or undermines employee discipline." *Id.*

Defendants' argument fails. Although it is evident that some forms of expression prohibited by the General Order are not protected under the First Amendment, it is equally clear that there remain "some conceivable set of circumstances" under which the regulation might limit protected speech. For instance, if an officer reported widespread and flagrant corruption amongst members of the Department, the resulting lack of trust in police might very well "[tend] to interfere with or to undermine the effectiveness of the Department to provide public services." General Policy A201.04(G)(2)(b). It would certainly "[tend] to adversely affect the confidence of the public in the integrity of the Department and/or its employees." General Policy A201.04(G)(2)(d). However, "disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department." *Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 191–92 (5th Cir. 1988) (footnotes omitted). Thus, the General Policy could, under some circumstances,

limit protected speech.[10]

However, the Supreme Court has long held that it is sometimes permissible to limit even protected speech: "The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Ed. of Twp. High Sch. Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968). Moreover, as Defendants point out, the government "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *United States v. Nat'l Treasury Emps. Union ("NTEU")*, 513 U.S. 454, 465 (1995). Because they are charged with maintaining public safety and order, police departments enjoy greater latitude in disciplinary and personnel regulations than ordinary government employers. *Nixon v. City of Houston*, 511 F.3d 494, 498 (5th Cir. 2007). However, the government bears the burden of justifying restrictions on speech involving matters of public concern. *NTEU*, 513 U.S.

---

[10] In a post-hearing letter brief, Defendants argue this hypothetical would not be prohibited by the General Policy because General Policy A201.04(G)(1) reads:

> Employees will not directly or indirectly, in any manner that makes them easily identifiable as an employee of the Department, publicly criticize or ridicule the actions or orders of a member of the Department, a judge, a prosecuting attorney, or other public official(s). This in no way infringes upon the rights of employees to act in their capacity as private residents in this regard.

*See* Def.'s Letter Brief [#45] at 1–2 (quoting APD General Policy A201.04(G)(1)). Defendants suggest the last sentence in section (G)(1) makes it "apparent that part (G)(2) of the General Order applies only to employees who speak *as employees* or who make themselves easily identifiable as employees." Def.'s Letter Brief at 2. However, the plain text of the regulations suggests exactly the opposite. Section (G)(1) prohibits public expression about a wide variety of public matters when it is clear the speaker is an APD employee; the last sentence limits this broad restriction, possibly in hope that it will pass constitutional muster. Section (G)(2), by contrast, prohibits enumerated kinds of expression, some of which are unprotected speech, about a more narrow range of topics; the drafters may not have thought it necessary to add further limits. Moreover, if the last sentence of (G)(1) was intended to apply to both (G)(1) and (G)(2), it would naturally appear after both provisions, not at the end of (G)(1). It would also likely be written in the plural (e.g., "These regulations in no way infringe . . ."). The Court therefore rejects Defendants' argument.

at 466–67; *Hoover v. Morales*, 164 F.3d 221, 226 (5th Cir. 1998).  Consequently, the pertinent question is whether the City can sufficiently justify the General Order even though it potentially restricts protected speech.  The Court holds that it cannot.

Plaintiff correctly characterizes the General Policy as a prior restraint on free speech.  A prior restraint on speech prohibits or censors speech before it can take place.  *Alexander v. United States*, 509 U.S. 544, 553-54 (1993).  Courts have long held that prior restraints on speech are strongly disfavored and are "unconstitutional limitations . . . except in exceptional circumstances."  *Test Masters Educ. Serv., Inc. v. Singh*, 428 F.3d 559, 579 (5th Cir. 2005).  Consequently, "[a]ny system of prior restraints on communication bears a heavy presumption against its constitutional validity."  *Id.*  This is especially true where, as here, the restraint potentially extends to all current and future APD employees.  *See NTEU*, 513 U.S. at 467–68.  In cases of prior restraint, the Supreme Court has modified the traditional *Pickering* test to impose a greater burden on the government: To prevail, the City must demonstrate that the interests of potential audiences in hearing the proscribed expression, as well as the interests of all current and future APD employees in engaging in it, are outweighed by the expression's "necessary impact on the actual operation" of APD.  *Id.* at 468 (quoting *Pickering*, 391 U.S. at 571).  Moreover, when the government enacts a regulation on speech intended to prevent anticipated harms, it must "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."  *Turner Broad. Sys., Inc. v. Fed. Commc'n Comm'n*, 512 U.S. 622, 664 (1994).

In *NTEU*, the Supreme Court invalidated a federal law "that broadly prohibit[ed] federal employees from accepting any compensation for making speeches or writing articles," even when

such expression was entirely unrelated to the employee's official duties. *NTEU*, 513 U.S. at 457. The Court acknowledged the law did not actually prohibit any speech, but held that denial of compensation was a sufficiently "significant burden on expressive activity," to offend the First Amendment. *Id.* at 469. In holding the law unconstitutional, the Supreme Court focused on the overbreadth of the statute, the interests of those denied expression under the law, and the burden on the "public's right to read and hear what the employees would otherwise have written and said." *Id.* at 469–70. In sum, the Court held that the government's interest, "that federal officers not misuse or appear to misuse power by accepting compensation for their unofficial and nonpolitical writing and speaking activities," although "undeniably powerful," was not sufficient to justify the law.

The Fifth Circuit reached a similar conclusion in *Hoover v. Morales*, regarding narrower restrictions on speech. *Hoover*, 164 F.3d at 223. The two restrictions at issue in *Hoover* were a Texas A&M University System ("TAMUS") policy prohibiting university professors from serving as consultants or expert witnesses in proceedings against the State; and an "expert witness rider" attached to the Texas Legislature's 1997 appropriations bill, stating no money from the bill could go to pay salary, benefits, or expenses of state employees who served as consultants or expert witnesses against the State. *Id.* The court acknowledged the regulations might be legitimate restrictions in some cases, but indicated, "the problem with the [regulations] is the quantity and quality of the speech they will curtail, which would not adversely affect the interest of the State . . . ." *Id.* at 226. In upholding the district court's injunction against the enforcement of these regulations, the Fifth Circuit stated, "when [the State] enacts a 'wholesale deterrent to a broad category of expression by a massive number of potential speakers', the burden of

-12-

justification is indeed heavy." *Id.* (quoting *NTEU*, 513 U.S. at 466–67).

Defendants here have failed to meet their heavy burden.  The two harms they recite in support of their motion are: "other officers . . . believed that Plaintiff's comments were offensive and crossed the line from valid criticism to denigrating the chain of command"; and viewing the document taken from the website "put questions in" one officer's mind and caused him to "change[] his perception" of Defendant Acevedo.  Def.'s Mot. Summ. J. at 17.  Significantly, Defendants do not claim either of these alleged harms had any concrete effect on the operations of the Department.[11]  More importantly, the General Order suffers from the same constitutional defect as the regulations in *NTEU* and *Hoover*: the legitimate applications of the regulation cannot justify the expansive scope of the restriction.  *See NTEU*, 513 U.S. at 469–70; *Hoover*, 164 F.3d at 226.  Also as in those cases, the General Policy potentially prohibits speech in which both the person making the expression, and the audience to that expression, have exceptionally strong interests.  Considering the overbreadth of the General Policy and the strong presumption against the constitutionality of prior restraints on speech, the City's claims simply do not demonstrate a sufficiently significant "necessary impact on the actual operation" of the

_____

[11] Defendants instead argue the heightened *NTEU* standard for prior restraints should not apply "when the restriction is narrowly tailored, imposed on an individual or narrow class of employees (rather than a broad class of employees), and imposed through a disciplinary action or process."  Def.'s Mot. Summ. J. at 18.  Defendants cite cases from other circuits in support of this position.  The Court notes, however, neither the Supreme Court nor the Fifth Circuit have ever adopted these distinctions.  Moreover, the Court disagrees with Defendants' argument on the merits for two reasons.  First, in *Hoover v. Morales*, 164 F.3d 221 (5th Cir. 1998), the Fifth Circuit upheld a challenge to regulation that was narrowly tailored, was imposed on an (arguably) narrow class of employees, and was imposed through disciplinary action.  The regulation in *Hoover* applied only to Texas A&M University professors; restricted only expert witness testimony or consultation; and was enforced through administrative process.  *Hoover*, 164 F.3d at 223–24.  Nevertheless, the *Hoover* court specifically cited and applied the *NTEU* standard.  *Id.* at 226.  Second, the Court disagrees with Defendants' characterization of the General Order.  Defendants argue that the APD General Order only applies to a "narrow class of employees" because it is limited in effect to APD employees; thus, defendants suggest, *NTEU* does not apply.  Def.'s Mot. Summ. J. at 18–19.  The Court disagrees that this restriction is "narrow"; indeed, it is difficult to imagine how an APD General Order could be more broad than to affect the entirety of APD.

Department to justify the restriction. *NTEU*, 513 U.S. at 468.   Therefore, the Court concludes

APD General Policy A201.04(G)(2) was an impermissible prior restraint on Plaintiff's free

speech, in violation of his First Amendment rights.

However, the Court concludes Plaintiff suffered no actual harm as a result of this

violation of his constitutional rights.   Indeed, Plaintiff concedes as much in his reply brief: "[T]he

reasons for the disciplinary action . . . were insubordination, criticisms of Acevedo, and

unauthorized use of a computer.   Any of these infractions could have resulted in Plaintiff's

termination . . . ." Pl.'s Resp. Summ. J. [#29] at 3.   Defendants argue, citing a case from the Tenth

Circuit, this deprives Plaintiff standing to challenge the General Order.   However, the Fifth

Circuit has held to the contrary: "A plaintiff is entitled to an award of nominal damages for the

violation of his civil rights, even when there is no injury." *Archie v. Christian*, 812 F.2d 250, 252

(5th Cir. 1987).   This rule is based on the Supreme Court's decision in *Carey v. Piphus*, that

denial of due process is actionable for nominal damages even when actual injury has not been

shown. *Carey v. Piphus*, 435 U.S. 247, 266 (1978).   The Fifth Circuit has explicitly held this rule

applies in the First Amendment context: "We believe that the rationale of *Carey* similarly

requires an award of nominal damages upon proof of infringement of a fundamental First

Amendment liberty." *Familias Unidas v. Briscoe*, 619 F.2d 391, 402 (5th Cir. 1980).   Moreover,

"an attorneys' fees award may be supported by an award of nominal damages since the successful

claim serves to vindicate constitutional rights." *Basiardanes v. City of Galveston*, 682 F.2d 1203,

1220 (5th Cir. 1982).   Therefore, the Court awards Plaintiff one dollar in nominal damages for

Defendants' prior restraint of Plaintiff's constitutional right to free speech.   The Court further

grants Plaintiff's request for a declaratory judgment that APD General Order A201.04.(G)(2)

constitutes a facially unconstitutional prior restraint on speech.

## 2.     Retaliation

Plaintiff further argues Defendants terminated his employment in retaliation for the exercise of his free speech rights.  For the following reasons, the Court disagrees.

To establish a constitutional claim for First Amendment retaliation, four elements must be shown: (1) that plaintiff suffered an adverse employment decision; (2) that the plaintiff's speech involved a matter of public concern; (3) that the plaintiff's interest in commenting on matters of public concern outweighs the defendants' interest in promoting workplace efficiency; and (4) that the plaintiff's speech motivated the defendants' action.  *DePree v. Saunders*, 588 F.3d 282 (5th Cir. 2009).  However, if the plaintiff speaks pursuant to his or her official duties, the speech is not protected by the First Amendment.  *See Davis v. McKinney*, 518 F.3d 304, 311–13 (5th Cir. 2008).  Only if the speech is made as a citizen, and not as part of the employee's official duties, must a court make inquiries (2) and (3) above.  *See id.* at 312.  Although the Court notes there is no evidence Defendant Cronig took any independent action against Plaintiff,  Defendants do not challenge prongs (1) or (4) of this test.  Def.'s Mot. Summ. J. at 13–14.  Further, Defendants do not contend Plaintiff's expression was pursuant to his official duties.  Thus, the remaining questions are whether Plaintiff's speech was on a matter of public concern, and if so whether his interest in engaging in such speech outweighs Defendants' interest in promoting workplace efficiency.

Although it is a close question, the Court concludes Plaintiff did speak on a matter of public concern.  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole

record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983).  "The scope of matters of public concern . . . is generally broad, and does not primarily depend on the motives of the speaker, rather the public interest of the speech itself." *Oscar Renda Contracting Co. v. City of Lubbock, Tex.*, 577 F.3d 264, 270 n.9 (5th Cir. 2009).  "As to content, the test is whether the information . . . was relevant to the public's evaluation of the performance of governmental agencies." *Davis v. Ector Cty., Tex.*, 40 F.3d 777, 783 (5th Cir. 1994) (internal quotations omitted).  Finally, "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community," governments enjoy "wide latitude" in regulating that expression. *Connick*, 461 U.S. at 146.

Plaintiff's conversation, and his posting of an excerpt of a website, related to alleged misconduct by the APD Chief of Police while working at a prior law enforcement job. Considered in the abstract, the inquiry appears simple because "speech relating to official misconduct . . . almost always involves matters of public concern." *Charles v. Grief*, 522 F.3d 508, 514 (5th Cir. 2008).  However, the facts in this case make the question much more difficult. First, Plaintiff claims he posted the document because he found the allegations against Defendant Acevedo "ironic" and "interesting," not because he wanted to expose potential or actual wrongdoing.  Pl. Depo. at 72, 75, 77.  Second, there is evidence Plaintiff was merely complaining about an internal personnel matter, namely the then-three-day-old termination of Officer Dustin Lee.  Third, Plaintiff acknowledged he did not know whether the website, or the information on it, was reliable when he posted the document on the bulletin board. *Id.* at 78–79.  Finally, the context of the expression suggests it was not intended as a comment on a matter of public concern: Plaintiff posted the information on an internal APD bulletin board that was not

-16-

accessible by the general public.  Given these facts, the Court has serious reservations about

characterizing Plaintiff's speech as a matter of public concern.  However, other factors—and an

abundance of caution—lead the Court to that conclusion.

First, it is a stretch to suggest the allegations against Defendant Acevedo "cannot be fairly

considered as relating to any matter of political, social, or other concern to the community."

*Connick*, 461 U.S. at 146.  This is particularly true if we note that the scope is "broad," and focus

primarily on the "public interest of the speech itself," rather than the motive of the speaker.

*Oscar Renda*, 577 F.3d at 270 n.9.  Further, the general subject matter of the document was of

sufficient public interest that it had been previously reported in the PressDemocrat, the

Sacramento Bee, and other newspapers.  Acevedo Aff. at 28–32.  Finally, Defendants concede

that at least one officer found the document of sufficient interest to raise questions in his mind

about Defendant Acevedo.  The Court therefore concludes Plaintiff spoke on a matter of public

concern.

However, it is clear that Plaintiff's interest in the expression is far outweighed by

Defendants' interest in promoting the efficiency of its public service.  Considerations relevant to

this balancing test are "whether the statement impairs discipline by superiors or harmony among

co-workers, has a detrimental impact on close working relationships for which personal loyalty

and confidence are necessary, or . . . interferes with the regular operation of the enterprise."

*Nixon*, 511 F.3d at 498.  Moreover, police departments are given more latitude in this analysis.

*Id.*

In *Nixon*, the Fifth Circuit held that a police officer's speech criticizing the Houston

Police Department ("HPD")'s high speed pursuit policy was not protected by the First

Amendment. *Id.* at 496.  In reaching its decision, the Court noted Nixon's statements and

conduct "smack[ed] of insubordination," and it was reasonable for HPD to anticipate a negative

impact on discipline, morale, and close working relationships between officers. *Id.* at 499.  The

court further indicated it was appropriate to consider the likelihood of future insubordination in

determining HPD's interest in regulating Nixon's speech.  *Id.*  The *Nixon* court noted that in the

retaliation context, "a government employer need not produce evidence of actual harm or

disruption to governmental operations," and that "courts have consistently given substantial

weight to . . . reasonable predictions of disruption." *Id.* at 499 n.8 (internal quotations omitted).

In ruling that HPD's interest outweighed Nixon's, the court specifically noted the greater latitude

given to police departments in making disciplinary and personnel regulations. *Id.* at 501.

Here, the balance clearly favors Defendants.  For the reasons enumerated above, the Court

concludes Plaintiff's legitimate interest in posting the document was relatively low.  By contrast,

Defendants' interest in regulating the expression was high.  As in *Nixon*, Plaintiff's expression

here was clearly insubordinate.  Defendants offer evidence indicating some impact on the morale

of the Department.  Moreover, Plaintiff's conduct and disciplinary history make it reasonable to

anticipate future insubordination or infractions tending to disrupt the efficiency of APD's

operations.  Finally, the Court is mindful of the greater latitude afforded police departments in

this context.  The Court therefore holds that Defendants' interest in regulating Plaintiff's

expression outweighed Plaintiff's interest in making it.  Consequently, Plaintiff's expression is

not protected by the First Amendment and his retaliation claim fails.[12]

---

[12] The Court briefly notes there is no tension between its holdings that the General Order is an
impermissible prior restraint on speech, and that Defendants did not retaliate against Plaintiff by terminating him for
posting the document on the bulletin board.  The General Order is facially unconstitutional because it is overbroad
and has the potential to impermissibly limit protected speech.  However, this conclusion has no bearing on the

**3.      Due Process**

Plaintiff claims Defendants deprived him of his "liberty and property rights," in violation of 42 U.S.C. § 1983.  Specifically, Plaintiff makes three due process claims: Defendants deprived him of his "property interest in his reputation"; his "liberty interest in free speech and freedom of press"; and although neither Plaintiff's complaint nor his response to Defendants' motion for summary judgment are entirely clear, Plaintiff seems to assert a deprivation of his liberty and property interests in his employment as well.  *See* First. Am. Compl. at ¶ 7.01.   Defendants have asserted the defense of qualified immunity.  For the following reasons, the Court rejects all of Plaintiff's due process claims.

42 U.S.C. § 1983 makes any violation of constitutional rights actionable against States. *See* 42 U.S.C. § 1983 (2003).  The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.  Government actions can violate procedural due process, substantive due process, or both.  *Severance v. Patterson*, 566 F.3d 490, 501 (5th Cir. 2009). Municipalities can also be sued under § 1983 for any of their official policies or customs that violate the constitution.  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690–91 (1978).  It is a plaintiff's responsibility to identify every policy that allegedly caused constitutional violations.  *Piotrowski v. City of Houston*, 237 F.3d 567, 579–80 (5th Cir. 2001).

Defendants move for summary judgment on the basis of qualified immunity.  "When a defendant pleads qualified immunity . . . and moves for summary judgment on that basis, a court

---

question of whether Defendants acted impermissibly in terminating Plaintiff for his specific speech.  The first inquiry focuses on the scope of the General Order; the second focuses on Plaintiff's conduct.

must decide (1) whether the facts alleged . . . by the plaintiff made out a violation of a constitutional right, and (2) whether that right was 'clearly established' at the time of the defendant's alleged misconduct." *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009). "Even if the official's conduct violated a clearly established constitutional right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable." *Finch v. Fort Bend Indep. Sch. Dist.*, 333 F.3d 555, 562 (5th Cir. 2003). To negate the defense, a plaintiff need not provide absolute proof, but must offer more than mere allegations. *Id.*

Plaintiff argues he was denied both procedural and substantive due process. "To bring a procedural due process claim under § 1983, a plaintiff must first identify a protected life, liberty, or property interest and then prove that governmental action resulted in a deprivation of that interest." *Baldwin v. Daniels*, 250 F.3d 943, 946 (5th Cir. 2001). "Procedural due process entitles a public employee with a property right in his employment to notice of the charges against the employee, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Fowler v. Smith*, 68 F.3d 124, 127 (5th Cir. 1995). Similarly, to succeed with a substantive due process claim the plaintiff must show a public official acted "arbitrarily or capriciously" in depriving him of a protected life, liberty, or property interest. *Id.* at 128.

Plaintiff's first claim, that Defendants deprived him of his property rights in his reputation without due process, is meritless. The Fifth Circuit has held that injury to reputation is not itself actionable; defamation is only actionable under § 1983 when it is associated with infringement of another constitutionally protected interest. *Breaux v. City of Garland*, 205 F.3d 150, 158 n.14 (5th Cir. 2000). Thus, Plaintiff's claim of deprivation of reputation as property, standing alone, must be denied.

Similarly, Plaintiff's second claim, that Defendants deprived him of his liberty interest in his freedom of speech or expression without due process, fails. The Court has already determined that Plaintiff's First Amendment rights were not violated by Defendants. A due process claim, whether procedural or substantive, first requires government deprivation of a protected life, liberty, or property interest. Because Defendants did not deprive Plaintiff of a protected liberty interest in his expression, Plaintiff's second claim lacks merit.

Finally, Plaintiff argues Defendants deprived him of both his liberty and property interests in his employment without due process. The Court rejects these claims. "The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution protects an individual's freedom to work and earn a living and to establish a home and position in one's community." *Cabrol v. Town of Youngsville*, 106 F.3d 101, 107 (5th Cir. 1997). "A public employee is deprived of a protected liberty interest *either* if terminated for a reason which was (i) false, (ii) publicized, and (iii) stigmatizing to his standing or reputation in his community *or* if terminated for a reason that was (i) false and (ii) had a stigmatizing effect such that (iii) he was denied other employment opportunities as a result." *Id.* For the purposes of summary judgment, Defendants concede Plaintiff had a property right in his continued employment as a patrol officer. Def.'s Mot. Summ. J. at 9 n.3. Assuming without deciding that Plaintiff was deprived of a valid liberty interest as well, his claim nevertheless fails.

The undisputed facts clearly establish that Plaintiff enjoyed all of the requirements of procedural due process. After his alleged 2008 conduct, Plaintiff was involved in an Internal Affairs investigation, a Disciplinary Review Hearing, and an appeal before an independent examiner. He received notice of the allegations against him, an explanation of the evidence

-21-

against him, and an opportunity to present his side of the story.  Likewise, given the many

independent levels of process involved, it is clear Defendants acted neither arbitrarily nor

capriciously; consequently, Plaintiff's substantive due process rights were not violated.  Indeed,

Plaintiff does not seem to challenge any of the process involved in sustaining the allegations

against him.  Rather, he complains he was denied due process because "he was never informed of

the charge of money laundering [in 2005] against him until the judgment was rendered, he was

never allowed any hearing on this most serious charge, and he was never presented with any

evidence that might conceivably substantiate [it]."  Pl.'s Resp. Summ. J. at 4.  He further asserts

Defendants Cronig and Acevedo acted arbitrarily and capriciously by not personally verifying the

truth of the money laundering allegations contained in the 2005 memo before relying on them in

assessing his punishment for the alleged 2008 conduct.  *Id.* at 5.

Defendants point out, and the Court agrees, Plaintiff's claims relating to his 2005

discipline are time-barred.  Plaintiff is attempting to challenge the process he received in 2005

through the vehicle of the 2008 memo.  Because no specified federal statute of limitations exists

for § 1983 claims, the forum state's general tort limitations period applies; in Texas, this period is

two years.  *Price v. City of San Antonio, Tex.*, 431 F.3d 890, 892 (5th Cir. 2005).  The period

begins to accrue when the plaintiff knows or has reason to know of the injury on which the action

is based.  *Burrell v. Newsome*, 883 F.2d 416 (5th Cir. 1989).  If Plaintiff wished to complain

about the process he received in 2005, he should have done so within two years of learning of it.

Plaintiff's signature acknowledging receipt of the memo is dated April 20, 2005; this suit was

filed on August 14, 2009.  Therefore, Plaintiff's claims regarding his 2005 discipline are time-

barred.

Even assuming Plaintiff has identified a protected interest of which Defendants deprived him, and further assuming his claims are not time-barred, the Court finds Defendants enjoy qualified immunity. The pertinent test is whether Defendants' actions were "objectively reasonable in light of clearly established law." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000). "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Id.* Here, Defendants relied on the contents of a 2005 memo that was signed by Plaintiff. Although Defendants lacked personal knowledge of what happened in 2005, it was objectively reasonable to rely on the representations of former APD Chief Knee as well as Plaintiff's signature. The Court acknowledges that Plaintiff's signature on the 2005 memo was not a direct admission of the truth of the charges contained within; however, Plaintiff agreed to the 60-day suspension so that Chief Knee would not exercise his "right to indefinitely suspend [Plaintiff] for the conduct described above," which included the money laundering allegation.[13] Plaintiff therefore recognized Chief Knee's right to indefinitely suspend him for, in part, the allegations of money laundering; Defendants' reliance on Plaintiff's apparent concession was objectively reasonable. Therefore, Defendants are entitled to qualified immunity and Plaintiff's due process claims fail.

Plaintiff was not denied either procedural or substantive due process in the handling of his

---

[13] The full text of Plaintiff's signature block reads:

I acknowledge my receipt of the above and foregoing memorandum of agreed temporary suspension and I understand that by entering into this disciplinary agreement the Chief forgoes his right to indefinitely suspend me for the conduct described above and that by agreeing to the suspension, I have no right to appeal this disciplinary action to the Civil Service Commission, to the District Court, or to an Independent Third Party Hearing Examiner.

2005 Memo at 5.

2008 discipline.  Plaintiff's due process claims regarding his 2005 discipline are time-barred.  In

the alternative, Defendants enjoyed qualified immunity.  Therefore, for the reasons stated above,

this Court rejects Plaintiff's Due Process claims.

**4.     State Law Claims**

Plaintiff makes two claims under Texas state law: first, Defendants defamed Plaintiff; and

second, Defendants engaged in a civil conspiracy against him.  Both defamation and civil

conspiracy are intentional torts under Texas law.  *Collins v. Ison-Newsome*, 73 S.W.3d 178,

181–82 (Tex. 2001).  For the following reasons, the Court rejects Plaintiff's state law claims.

Plaintiff brings this suit against both the City of Austin and individual defendants.

Plaintiff's suit against the individual defendants must be dismissed pursuant to § 101.106 of the

Texas Tort Claims Act ("TTCA").  TEX. CIV. PRAC. & REM. CODE ANN. § 101.106 (West 2008).

Plaintiff's claims against the City are barred by governmental immunity under TTCA § 101.057.

*Id.* § 101.057.

TTCA §§ 101.106(a) and (e) are election-of-remedies provisions.  They state:

(a) The filing of a suit under this chapter against a governmental unit constitutes
and irrevocable election by the plaintiff and immediately and forever bars any suit
or recovery by the plaintiff against any individual employee of the governmental
unit regarding the same subject matter.

. . . .

(e) If a suit is filed under this chapter against both a governmental unit and any of
its employees, the employees shall immediately be dismissed on the filing of a
motion by the governmental unit.

*Id.* §§ 101.106(a), (e).  The purpose of these provisions is to "force a plaintiff to decide at the

outset whether an employee acted independently and is thus solely liable, or acted within the

general scope of his or her employment such that the governmental unit is vicariously liable."

*Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 657 (Tex. 2008). TTCA § 101.106

applies to all tort theories alleged against a governmental unit, whether or not the TTCA waives

immunity for them. *Id.* at 658–59. Defendants asserted the protections of the TTCA in their

answer and now move for dismissal of the claims against Defendants Acevedo and Cronig.

TTCA § 101.106(e) requires this Court to do so.[14]  Accordingly, Plaintiff's state law claims

against Defendants Acevedo and Cronig are dismissed.

Plaintiff's state law claims against the City must also be denied.  "In Texas, sovereign

immunity deprives a trial court of subject matter jurisdiction for lawsuits in which the state or

certain governmental units have been sued unless the state consents to suit."  *Tex. Dep't of Parks*

*and Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004).  Although the TTCA does waive

sovereign immunity for some suits against the government, including some torts, it does not

waive immunity for intentional torts.  TTCA § 101.057(2).  Plaintiff's state law claims against the

City based on the intentional torts of defamation and civil conspiracy are therefore defeated by

sovereign immunity.  *See Dallas County v. Harper*, 913 S.W.2d 207, 207–08 (Tex. 1995)

(defamation); *Williams v. Houston Firemen's Relief and Ret. Fund*, 121 S.W.3d 415

(Tex.App.–Houston [1st Dist.] 2003) (conspiracy).  Plaintiff provides no other possible waiver of

sovereign immunity applicable to this case and the Court is not aware of one.  Consequently,

Plaintiff's state law claims against the City must be denied.

---

[14] Plaintiff argues in his response that his state law tort claims are brought only against Defendants Cronig and Acevedo in their individual capacity, not against the City. Thus, Plaintiff argues, the provisions of TTCA § 101.106 are not applicable.  The Court rejects this argument because it finds no support in Plaintiff's complaint.  In some parts of his complaint, Plaintiff refers specifically to "Defendant Cronig" or "Defendant Acevedo."  However, when alleging his tort claims, Plaintiff uses the general term "Defendants."  Because the City is clearly listed as a Defendant, and because Plaintiff made no indication he intended to limit the scope of his tort claims, the Court finds that Plaintiff's tort claims are alleged against all Defendants.

The TTCA requires dismissal of Plaintiff's state law claims against Defendants Acevedo and Cronig. Texas has not waived the sovereign immunity of its municipalities for intentional torts. Thus, all of Plaintiff's state law claims must be denied.

**Conclusion**

In accordance with the foregoing,

IT IS ORDERED that Plaintiff's Motion for Summary Judgment [#25] is GRANTED with respect to Plaintiff's claim that APD General Policy A201.04(G)(2) is an unconstitutional prior restraint on speech.[15]

IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment [#25] is otherwise DENIED; consequently, Defendants' Motion for Summary Judgment [#22] is otherwise GRANTED.

SIGNED this the 20ᵗʰ day of September 2010.

SAM SPARKS
UNITED STATES DISTRICT JUDGE

---

[15] Per local Rule CV-7(i), "motions for an award of attorney's fees shall be filed and served no later than 14 days after entry of judgment." Local Rule CV-7(i). Objections must be filed on or before 14 days after the date of filing. *Id.* "If there is no timely objection, the Court may grant the motion as unopposed." *Id.*